Filed 7/11/13

**CERTIFICATION FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| NICHOLAS SHEARIN et al., | B239730 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC400279) |
| v. | |
| EDMUND G. BROWN, JR., as Governor, etc., et al., | |
| Defendants and Respondents. | |

APPEAL from orders of the Superior Court of the County of Los Angeles, Kenneth R. Freeman and Carl J. West, Judges. Affirmed, in part, dismissed, in part.

Kiesel Boucher Larson, Paul R. Kiesel, Steven D. Archer, Jeffrey A. Koncius; Law Offices of Sanford Jossen and Sanford Jossen for Plaintiffs and Appellants.

Sedgwick, Michael F. Healy and Kelly Savage Day for Defendants and Respondents.

# INTRODUCTION

Plaintiff and appellant Robert Lopez (plaintiff) filed a class action against defendants and respondents (defendants)[1] seeking damages for himself and all others similarly situated for allegedly being detained in prison beyond their lawful release dates. He appeals from the trial court's order denying his motion for class certification, as well as the trial court's earlier order sustaining demurrers to plaintiff's causes of action under section 1983 of title 42 of the United States Code (section 1983 claims).

We hold that because there was substantial evidence supporting the trial court's findings that common issues did not predominate and that plaintiff's claims were not typical of the putative class members' claims, the trial court did not abuse its discretion in denying the class certification motion. We further hold that the order sustaining the demurrers to plaintiff's section 1983 claims is nonappealable. We therefore affirm the order denying the class certification motion and dismiss the appeal with respect to the order sustaining the demurrers to the section 1983 claims.

---

[1] Defendants are the California Department of Corrections and Rehabilitation (Department) and the State of California. All other defendants named in the operative complaint have been dismissed.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     Operative Complaint[2]

The third amended complaint asserted three causes of action against defendants: (1) wrongful detention in violation of the California Constitution and Civil Code section 52.3; (2) false imprisonment; and (3) negligence based on breach of a mandatory duty. That complaint defined the class as "all persons who have been tried, convicted and incarcerated from crimes in the State of California, whether adult or juvenile, who have had their sentence miscalculated and who have remained incarcerated for a period in excess of the time for which they should have been incarcerated had all lawful credits been applied and their sentence(s) been calculated correctly based on all applicable laws during the course of their incarceration."

In the third amended complaint, plaintiff explained the gravamen of the action as follows:  "The Plaintiffs, on behalf of themselves and the class of similarly situated persons described below, seek damages to the extent allowable under applicable Federal and State law from all Defendants named herein for false imprisonment and violation of their Constitutionally protected civil rights, privileges and immunities because they were not timely released from Defendants penal facilities upon the completion of their respective correctly calculated sentences as required under the laws of the State of California.  The Defendants failure to timely release the Plaintiffs resulted in their being 'over-detained' during which time they continued to be treated in all respects as though they were prisoners notwithstanding that their correctly calculated sentences had been fulfilled and all legal justification for their continued imprisonment and treatment as

---

[2]     The operative complaint for purposes of the class certification motion was the third amended complaint.  The trial court had previously sustained without leave to amend demurrers to certain of the causes of action in the first amended complaint, including to plaintiff's section 1983 claims.  Because, as discussed below, the order sustaining the demurrers to the section 1983 claims is nonappealable, we limit the factual and procedural discussion to matters that relate only to the ruling on the class certification motion.

3

prisoners had ended. [¶] . . . *The Plaintiffs' respective over-detentions occurred as a direct and proximate result of the Defendants systematic pattern and practices* of failure, neglect or disregard of Plaintiffs and all others similarly situated civil rights by: [¶] a. Failing to implement a system for the correct calculation of release dates including, but not limited to, the calculation of their minimum and maximum sentencing periods and early release dates after application of all appropriate credits consistent with applicable law; [¶] b. Failing to implement a system for the timely release of prisoners upon the completion of their respective correctly calculated sentence(s); [¶] c. Failing to timely release prisoners from penal institutions upon the conclusion and satisfaction of their correctly-calculated sentences." (Italics added.)

Plaintiff further alleged that because common issues of law and fact predominated, defendants' liability to each class member could be established by common proof on a classwide basis. Plaintiff asserted, "This case presents issues of law and fact common to the class as to *whether there is a systematic pattern and practice* by the Defendants, and each of them whereby individuals under their care, custody, control and supervision were routinely over-detained in penal facilities after their properly-calculated sentences had been completed due to miscalculations or failure to make adjustments in sentences given applicable law, all in violation of Plaintiff's Federal and State Constitutional rights. These questions of law and fact predominate over questions that affect only individual class members. *Proof of a common or single state of facts or systematic failure will establish the right of each member of the class to recover*. Damages for over-detention can then be calculated on a simple per diem basis." (Italics added.)

Plaintiff repeatedly emphasized that the class claims arose from defendants' systematic pattern and practice that resulted in miscalculations of the putative class members' sentences and the alleged over-detentions. For example, plaintiff alleged, "Defendants and each of them maintained and permitted *a continuing policy, custom and practice* including but not limited to, failing to determine the correctly calculated sentences for prisoners. Defendants thereby *acted with deliberate indifference* toward individuals incarcerated in facilities by continuing to incarcerate them after the expiration

4

or satisfaction of their correctly calculated sentences resulting in their loss of freedom, in violation of their constitutional rights. These *policies, customs and practices* are evidenced in part in the failure of Defendants to comply with applicable State law, enactments, regulations and Court Orders for the release of Plaintiffs and all others similarly situated. By so doing, the Defendants, and each of them violate Court imposed sentencing Orders and leave Plaintiffs to remain incarcerated after they should have been released. [¶] The Defendants *policies, customs and practices were the proximate cause of the violations of Plaintiffs' rights* described herein. The Defendants, and each of them, are liable for all of the injuries sustained by Plaintiffs." (Italics added.)

### B.    Motion to Certify

Following the overruling of defendants' demurrer to the third amended complaint, plaintiff filed his motion for class certification. According to plaintiff, the common questions of law and fact predominated over the issues to be adjudicated individually. Plaintiff set forth the common issues as: "(a) Whether the members of the Class were under the care, custody, control and supervision of Defendants, and each of them; (b) Whether the Defendants were under a duty to accurately and properly calculate sentences for the members of the Class including applying all appropriate credits under applicable law; (c) Whether the members of the Class were entitled to be released after serving the correctly-calculated sentence; (d) Whether the members of the Class were over-detained and remained imprisoned in a penal facility, after their lawful right to release had passed, under sentences which were incorrectly or inaccurately calculated by the Defendants; (e) Whether the members of the Class continued to be treated in all respects as prisoners during the period of their respective over-detentions; (f) *Whether the Defendants engaged in a pattern or practice that deprived any person of rights, privileges, or immunities* secured or protected by the Constitution or laws of the United States or by the Constitution or laws of California; (g) Whether, by failing to release the members of the Class after their lawful, correctly calculated sentences had been completed or otherwise fulfilled, the Defendants imprisoned them without lawful authority or legal justification;

5

(h) *Whether Defendants created, conducted, allowed and ratified a systematic pattern and practice which fostered the ongoing breach of their mandatory duties and was the direct and proximate cause of the members of the Class's respective over-detentions*; (i) Whether the members of the Class have been injured by the Defendant's conduct; and (j) Whether the members of the Class have sustained damages and, if so, what is the proper measure and appropriate formula to be applied in determining such damages." (Italics added.) Plaintiff also asserted in the class certification motion that his claims were typical of the claims of other putative class members.

Plaintiff's class certification motion was supported by the declaration of plaintiff's attorney, Steven Archer, which declaration had attached as exhibits, inter alia, excerpts from the transcript of the deposition of Karen Elliott, the person designated by the Department as most qualified to testify on the Department's behalf; copies of "early/late release reports" produced by defendants; and certain documents obtained from the Department pursuant to a California Public Records Act (CPRA) (Gov. Code, §§ 6250 et seq.) request.

The excerpts from Ms. Elliott's deposition transcript contained the following testimony: Ms. Elliott had worked for the Department in various capacities for 23 years. The Department operated under and consistent with California law. The Department was assigned responsibility for confining as inmates in penal institutions persons who had been convicted of various crimes in California. The Department had an obligation or duty to complete inmate time computations in a uniform manner. It also had a duty to ensure that release date calculations were correct. When a case records analyst received a prison packet for a prisoner at an inmate reception, the analyst would review and analyze the documents in the packet for the purpose of calculating a release date, which was usually referred to as an "earliest possible release date." Upon transfer of an inmate to a "main line institution," the Department would conduct subsequent intake audits to ensure, inter alia, that the inmate's calculated release date was correct. Miscalculations of release dates should have been "caught and corrected" at such subsequent intake audits. At each intake audit, whether it was a reception intake audit or an intake audit following transfer

to a mainline institution, the records analyst was expected to review and confirm the calculations on the inmate's term. The Department also conducted a "60-day parole" audit prior to an inmate's release. That audit should have detected over-detentions, but in two sample cases, the records analysts did not detect the over-detentions or correct them. The goal and expectation of the Department was that the release dates for all inmates be correctly calculated. But that goal was not "achieved 100%" of the time. When an early release of an inmate occurred, "headquarters" requested a document that explained "what happened." In the case of a late release, a document explaining what happened was also generated, and those reports were sent to an analyst who would input the information into a spreadsheet called an "early/late release report." The determination that there had been a late release was not made by the records analyst who created the early/late release report, but rather by a manager or supervisor of the institution responsible for the late release. A manager should have been experienced enough to have verified the correct release date and the fact of late release.[3]

According to the declaration of attorney Archer, the documents produce in response to the CPRA request showed that, "for every entry on those documents that is identified as either 'TRUE' or 'YES' there is a number which indicates how many days the individual was over-detained (or in one case under-detained and released too early)." Attorney Archer compared the "early/late release reports" produced by defendants in discovery to the documents produced in response to the CPRA request and confirmed that every one of the reports, save one, "appears in the [CPRA] documents as a 'TRUE' or 'YES' and the number of days match up as well." He concluded from the documents that "the Defendants [had] already checked, re-calculated and confirmed that they [had] over detained the 594 inmates comprising the Class sought to be certified [in this case] for a total of 65,643 days during the period January 1, 2004-May 4, 2008."

Defendants opposed the class certification motion and supported that opposition with their attorney's declaration that attached, inter alia, excerpts from Ms. Elliott's

---

[3] If there was a late release, the amount of days of over-detention would be credited against the term of parole.

deposition transcript and letters sent by the Department concerning a sentencing error in the amended abstract of judgment and the minute order for plaintiff's sentencing hearing. According to the letters sent by the Department, it detected and addressed the error in plaintiff's sentence as follows: The operative complaint established that plaintiff was convicted of assault with a firearm in violation of Penal Code section 245, subdivision (a)(2), possession of marijuana in violation of Health and Safety Code section 11359, and possession of marijuana for sale in violation of Health and Safety Code section 11378. On March 16, 2006, three months before plaintiff should have been released if he had been properly sentenced, the Department sent a letter to the sentencing court, copied to the District Attorney and plaintiff's public defender, advising of the following: "A review of the documents delivered with the above-named inmate [plaintiff] indicates the Abstract of Judgment and/or Minute Order may be in error, or incomplete, for the following reasons: [¶] The Abstract of Judgment and Minute Order reflect Count 12, Health and Safety Code Section 11359, Poss Marij F/Sale, upper term 3 years, plus an enhancement pursuant to Penal Code (PC) Section 186.22(b)(1) sentenced 10 years consecutive to Count 12. Penal Code [s]ection 186.22(b)(1) reflects, 'If the felony is a serious felony as defined in subdivision (c) of Section 1192.7, the person shall be punished by an additional term of 5 years. If the felony is a violent felony, as defined in subdivision (c) of Section 667.5, the person shall be punished by an additional term of 10 years.' Health and Safety Code [section] 11359 is not a serious or violent felony, therefore, the [Penal Code s]ection 186.22(b)(1) enhancement carries a range of 2, 3, or 4 years. [¶] May the Court please note that the information does not reflect Count 12 and we are not in receipt of amended charges. We ask the Court to please clarify the sentencing in this case." Apparently, neither plaintiff nor his public defender took any action to correct the sentencing error, nor did the trial court or the District Attorney. On June 19, 2006, the Department again sent a letter to the sentencing court requesting a response to its March 16, 2006, letter. In November 2007, the Department received an amended abstract of judgment and minute order concerning plaintiff's sentence. Plaintiff's release date was then recalculated, and, according to plaintiff, he was released

on November 28, 2007.  Ms. Elliott testified that when plaintiff's sentence was ultimately corrected, she calculated that he had been over-detained by 518 days and should have been released on June 26, 2006.

Following the hearing on the motion for class certification, the trial court in a written ruling explained its decision denying the motion for class certification, in part, as follows:  "The Court determines that [p]laintiff has not demonstrated that common questions of law or fact predominate among the putative class.  In order to assess whether the [d]efendants are liable for the overdetention of putative classmembers, the Court would be required to make highly individualized determinations as to the specific circumstances of each class member.  Defendants identify some of these questions as follows: [¶]  1.  Has the potential class member been overdetained? [¶]  2.  If so, what caused the overdetention? [¶]  3.  Who, if anyone, is liable for the overdetention? [¶]  4. If the potential class member has been overdetained, how long has he been overdetained? [¶]  5. Has the potential classmember complied with the requirements of the Claims Act? [¶]  The Court agrees that these questions, at minimum, will be individualized as to each classmember, the resolution of which will be required in order to determine whether the Defendants are liable for overdetention.  If there was a lawful reason for the overdetention, then this would have to be resolved as to each putative classmember to even assess whether the person is a member of the class.  [¶]  Plaintiffs contend that the only question is whether overdetention occurred and if so, what compensation is due. However, whether overdetention occurred, and the reasons for that overdetention would require highly individualized assessments as to each inmate in order to determine the State's liability."

"Again, there could be many reasons for overdetention of a classmember (including, as is the case with [p]laintiff, an apparent error in the minute order imposing the sentence), and there is no evidence of a policy or practice of overdetention in this case which was applied on a class basis by the named [d]efendants (including [the Department]).  To the contrary, the evidence before the Court indicates that the [the Department] engages in several calculations to come up with the [earliest possible release

date].  [¶] . . . [¶]  Here, the Court is not persuaded that the evidence before it on certification shows a policy of 'deliberate indifference' to the rights of [p]laintiff and the class.  There is no evidence, in other words, demonstrating that the class has suffered the same alleged harm based on the same commonly applied policy or practice.  [¶] . . . [¶] Absent evidence of a policy or practice of overdetention (resulting in deliberate indifference to the classmembers' rights, as was the case in *Vanke* [*v. Block* (C.D. Cal. Nov. 7, 1998, No. 98-4111) 1998 U.S. Dist. LEXIS 23844]), the Court would have to assess *why* inmates were overdetained for each classmember.  The class, as defined, may have had their terms extended or miscalculated for any of a number of reasons."

"[Plaintiff] is the class representative.  The [complaint] alleges that [plaintiff] was convicted of assault with a firearm and possession of a controlled substance for sale on April 5, 20[0]1.  While the evidence shows that [p]laintiff was extended past his release date (plaintiff claims he was overdetained 767 days; the [the Department] claims it was 518 days), the reason for this was apparently due to an error in the minute order which sentenced him.  Exhibit D to [d]efendants' compendium is a letter from one L. Donaldson of the [the Department's] Legal Processing Unit ('LPU') to Judge Mark Mooney regarding the sentencing of [plaintiff].  This letter suggests that it was not the [Department] who was responsible for overdetaining [p]laintiff, it was the Court order itself which the [Department] was required to follow under the law.  [¶] . . . Thus, [plaintiff's] claim is not typical because while he was incarcerated past his scheduled released date, this was due to the minute order error and not any acts of the [defendants] in this litigation.  Accordingly, [plaintiff] does not have claims typical of those of the class, as defined."

"For the foregoing reasons, the motion for class certification is denied.  While the Court is troubled by the evidence suggesting that 594 inmates during the class period may have been overdetained, the evidence before the Court shows that treating these as class claims would be unmanageable, due to the highly individualized assessments the Court would have to make.  Under such circumstances, the class mechanism would not be the superior means of handling these claims, nor would it be superior to consolidate these

10

claims in a single action.  Plaintiff has not otherwise demonstrated, by substantial evidence, that the elements supporting class certification are satisfied."

## DISCUSSION

### A. Denial of Class Certification

#### 1. Standard of Review

The California Supreme Court in enunciating the standard of review of a class certification order stated, "On review of a class certification order, an appellate court's inquiry is narrowly circumscribed.  'The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision *great deference on appeal, reversing only for a manifest abuse of discretion:* "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." [Citation.]  A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions. [Citations.]'  [Citations.]  Predominance is a factual question; accordingly, the trial court's finding that common issues predominate generally is reviewed for substantial evidence. [Citation.]  We must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . . .' [Citation.]"  (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1022, italics added.)  """"Any valid pertinent reason stated will be sufficient to uphold the order."'  [Citations.]"  (*Sav-On Drug Stores v. Superior Court* (2004) 34 Cal.4th 319, 326-27 (*Sav-On Drug Stores*).)

In *Sav-On Drug Stores, supra,* 34 Cal.4th 319, the Supreme Court, in explaining the analytical process employed by appellate courts when reviewing class certification motions, said, "As the focus in a certification dispute is on what type of questions— common or individual—are likely to arise in the action, rather than on the merits of the

11

case [citations], in determining whether there is substantial evidence to support a trial court's certification order, we consider whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.  [Citations.]  'Reviewing courts consistently look to the allegations of the complaint and the declarations of attorneys representing the plaintiff class to resolve this question'  [Citations.]"  (*Id.* at p. 327.)

### 2.      *Applicable Legal Principles*

The Supreme Court has emphasized that the class action procedure is rooted in equitable principles.  "'The class action is a product of the court of equity—codified in section 382 of the Code of Civil Procedure.  It rests on considerations of necessity and convenience, adopted to prevent a failure of justice.'  [Citation.]"  (*Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1078.)

The Court has set forth the established standards for class certification generally, as follows:  "Code of Civil Procedure section 382 authorizes class actions 'when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . .'  The party seeking certification has the burden to establish the existence of both an ascertainable class and a well-defined community of interest among class members.  [Citations.]  The 'community of interest' requirement embodies three factors:  (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.  [Citation.]"  (*Sav-On Drug Stores, supra*, 34 Cal.4th at p. 326.)

"The certification question is 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.'  [Citation.]  A trial court ruling on a certification motion determines 'whether . . . the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.'  [Citations.]"  (*Sav-On Drug Stores, supra,* 34 Cal.4th at p. 326.)

### 3. Analysis

#### a. Predominance of questions of law or fact

On the community of interest element, the trial court concluded that plaintiff had not provided evidence of a common policy or practice that caused the over-detentions and which could therefore be the basis for a classwide adjudication on liability. There was substantial evidence to support that conclusion.

The operative complaint and the motion to certify the class repeatedly stated that defendants engaged in a "systematic pattern and practice" that resulted in miscalculations of the putative class members' release dates and the over-detentions in issue. But plaintiff did not identify or produce evidence of a specific policy or practice that uniformly was applied to the calculations of the putative class members' release dates and which resulted in the over-detentions. For example, if plaintiff had presented evidence showing that defendants adopted a policy, not mandated by law or regulation, pursuant to which the Department held each inmate beyond his or her lawful release date to check for any outstanding warrants, thereby proximately causing a classwide over-detention of inmates, such a specific policy and practice arguably may have been amenable to class treatment. Because plaintiff did not identify or produce evidence of such a specific policy or practice, the trial court did not abuse its discretion in concluding that the miscalculations were likely the result of various causes, and not the result of a uniform, classwide cause.

The circumstances of plaintiff's over-detention provide an illustration of the reasonableness of the trial court's conclusion. Contrary to the allegations of the operative complaint, the Department did not miscalculate plaintiff's release date based upon the uniform application of any specific policy or practice, classwide or otherwise. Instead, defendants' evidence showed that the trial court made a sentencing error in its minute order that defendants eventually detected and attempted to correct by sending two letters to the trial court to rectify the error.

13

Thus, even assuming plaintiff could establish defendants' liability to him based on the seemingly unique and highly individualized facts that gave rise to his over-detention—a questionable proposition—that liability determination would not operate to adjudicate the liability of defendants to each of the almost 600 putative class members. That is because, as discussed below, the evidence does not show that plaintiff's claim is typical of the claims of the putative class members or that it was the result of any uniform policy or practice.

Plaintiff argues that defendants were obligated to ascertain and remedy every miscalculation error so that no over-detentions would occur. Even if such a claim were consistent with plaintiff's allegations in the operative complaint concerning a classwide pattern and practice, this may not always be possible, as demonstrated by plaintiff's individual claim.

Plaintiff's apparent suggestion that the mere fact that the miscalculations occurred supports an inference that they must have been the result of some uniform policy or practice. But that suggestion avoids the essential question that must be answered in order to certify the alleged class—what was the alleged cause, or what were the alleged causes, of the miscalculations? The fact of the over-detentions, standing alone, was insufficient to show that they were the proximate result of defendants' uniform classwide conduct, and could not, without more, support a finding of liability on a classwide basis. "'What matters to class certification . . . is not the raising of common "questions"—even droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.'" (*Wal-Mart Stores, Inc. v. Dukes* (2011) ___ U.S. ___, 131 S.Ct. 2541, 2551, quoting Nagareda, *Class Certification in the Age of Aggregate Proof* (2009) 84 N.Y.U. L.Rev. 97, 132.)

We note that although plaintiff submitted evidence that 594 inmates may have been over-detained during the time period covered by the documentation, he provided no evidence showing the total number of inmates released during that same period. Absent such a showing, it cannot be determined whether the total number of inmates over-

14

detained was statistically significant. If 1,000 or fewer inmates were released during the covered time period, the fact that 594 of them were over-detained may well have been indicative that the over-detentions were the result of some uniformly applied policy or practice. On the other hand, if 60,000 inmates were released during the covered time period, the fact that only 594 were over-detained would not necessarily tend to show the existence of a policy or practice.

Even if the over-detentions alone were sufficient to show a uniform policy or practice, there was nothing before the trial court tending to show that the policy or practice was the result of "deliberate indifference" on the part of defendants, as alleged in the complaint. To the extent plaintiff's Civil Code section 52.3 and common law false imprisonment claims were based on underlying Constitutional violations, evidence tending to show such deliberate indifference on a classwide basis would be required. (See *City of Canton v. Harris* (1989) 489 U.S. 378, 388-389 [if the constitutional violation upon which a 42 U.S.C. section 1983 claim is based is the result of a public entity's deliberate indifference to the constitutional right in issue, the entity may be liable for the violation].) Instead of making such a showing, plaintiff contends that deliberate indifference to the putative class members' rights can be presumed from the fact of the over-detentions alone. But, there must be allegations and some proof reasonably tending to show a specific policy or practice to support an inference that a defendant public entity implemented the policy or practice with deliberate indifference toward the inmates' rights. (See, e.g., *Vanke v. Block*[*, supra,*] 1998 U.S. Dist. LEXIS 23488 at * 1 [sheriff maintained an alleged policy of continuing to hold pretrial detainees who were entitled to be released after acquittal or dismissal of charges against them in order to check for warrants, wants, and holds].)

Here, the evidence concerning plaintiff's over-detention did not support an inference that his delayed release was the result of defendant's deliberate indifference to his rights; rather it showed that defendants attempted to rectify the sentencing error in the minute order prior to his lawful release date, albeit unsuccessfully. And even if the evidence relating to plaintiff's over-detention had shown that defendants acted with

15

deliberate indifference toward plaintiff's rights, that evidence did not support an inference that defendants acted with the same indifference toward the rights of the putative class members. Absent such a classwide showing on the deliberate indifference issue, it was not unreasonable for the trial court to conclude that the issue could not be adjudicated on a classwide basis due to the individualized nature of the issue.

In addition, plaintiff's claims were all based on the allegation that he and the putative class members were detained beyond their "lawful" sentences. As the trial court reasonably concluded, the issue of whether the detentions were lawful would require individualized proof. In addition to the circumstance of plaintiff's over-detention— which raised a serious question whether defendants were liable for his alleged over-detention because, as discussed, it was the result of a lawful court order—Ms. Elliott provided at least two other examples of when an inmate could lawfully be over-detained: (1) when a warrant hold had been placed on the inmate at the time of his scheduled release; and (2) when a parole board of hearings placed a hold on a sexually violent predator or a mentally disordered offender awaiting a civil judgment. That evidence itself supported a reasonable inference that the issue of the lawfulness of a given over-detention was not susceptible to classwide or common proof because of a lack of predominant questions of law or fact.

### b. Typicality of claims

The trial court also denied the certification motion based on its finding that plaintiff's claims were not typical of the alleged claims of the putative class members. Based on defendants' evidence concerning the circumstances of plaintiff's over-detention, the trial court's finding on the typicality element was supported by substantial evidence and therefore not an abuse of discretion.

Fairly read, the operative complaint is based on the assertion that the Department miscalculated the putative class members' release dates based on a policy, pattern, or practice of the Department that proximately caused the alleged over-detentions. The evidence concerning plaintiff's over-detention, however, raised a reasonable inference

16

that the Department did not miscalculate his release date because the calculation was based, not on any policy or practice, but upon a lawful order of the trial court. Although plaintiff maintains in his reply brief that the Department should have detected the sentencing error earlier and done more to rectify it once it was discovered, those contentions are based upon an alleged mandatory duty—to detect and rectify sentencing errors—that appears to be different from the mandatory duty pleaded in the operative complaint—to calculate accurately release dates. That plaintiff's theory of liability against the Department now is apparently based on an alleged duty that is fundamentally different from the duty upon which the class members' claims were based supports the trial court's conclusion that plaintiff's claims were not typical of those allegedly held by the putative class members.

In addition, the government tort claim form (Gov. Code, § 905.2) that plaintiff filed states that the value of his claim is $2,950,000. But according to the motion for class certification, "[h]ere, the effort required to effectively bring an individual suit is high compared to *the relatively small amount of potential recovery*," i.e., the respective value of the each class member's individual claim is so de minimis that it justifies bringing those claims as a class action. Thus, the disparity between the alleged value of plaintiff's claim and that of the other putative class members would also support the conclusion that his claim was not typical of the class claims. In light of the evidence on the typicality element, the trial court did not abuse its discretion in denying the motion for class certification on that basis.

### B.     Appealability of Order Sustaining Demurrer

In addition to seeking review of the trial court's order denying his motion for class certification, plaintiff seeks review of the trial court's earlier order sustaining without leave to amend defendants' demurrers to plaintiff's section 1983 claims in the first amended complaint. Defendants, however, contend that although the order denying class certification is appealable under the well established "death knell" exception to the one final judgment rule, the order sustaining the demurrer is not appealable because it is an

17

interim order. In response to this contention, plaintiffs submitted a letter brief in which they asserted that the order sustaining the demurrers is appealable under Code of Civil Procedure section 906 (section 906) as an interim order that is related to the merits of, or otherwise necessarily affects, the order denying class certification. We agree with defendants that the order sustaining the demurrer is not appealable, and, for the reasons explained below, we dismiss the appeal from that order.

### 1. One Final Judgment Rule

The Supreme Court made clear that "[u]nder the one final judgment rule, '"an appeal may be taken only from the final judgment in an entire action."' [Citations.] '"The theory [behind the rule] is that piecemeal disposition and multiple appeals in a single action would be oppressive and costly, and that a review of intermediate rulings should await the final disposition of the case."' [Citations.] [¶] The one final judgment rule is 'a fundamental principle of appellate practice' [citation], recognized and enforced in this state since the 19th century. [Citations.]" (*In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 756 (*Baycol*).)

### 2. Death Knell Exception

The Supreme Court described the "death knell" exception to the one final judgment rule for class actions, saying, "The right to appeal in California is generally governed by the 'one final judgment' rule, under which most interlocutory orders are not appealable. (See Code Civ. Proc., § 904.1.) (Footnote omitted.) In *Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695 [63 Cal.Rptr. 724, 433 P.2d 732] (*Daar*), however, concerned that orders dismissing all class action claims might in some instances escape review, we adopted a 'death knell' doctrine that allowed a party to appeal such orders immediately." (*Baycol, supra*, 51 Cal.4th at p. 754.)

The Supreme Court reviewed the origins of the doctrine, explaining, "In *Daar*, the plaintiff filed a putative class action. The trial court sustained a demurrer, concluding the plaintiff could neither maintain a class action nor satisfy the jurisdictional minimum

18

amount in controversy for superior court actions, and transferred the action to the municipal court.  On appeal, we considered as a threshold issue whether such an order, determining the plaintiff could not maintain his claims as a class action but could seek individual relief, was appealable, and we concluded it was.  What mattered was not the form of the order or judgment but its impact.  (*Daar*, at pp. 698-699.)  Because the order effectively rang the death knell for the class claims, we treated it as in essence a final judgment on those claims, which was appealable immediately.  **[**Citations.**]**"  (*Baycol, supra*, 51 Cal.4th at p. 757.)

The court added, "Equally important in *Daar* was the circumstance that the order appealed from was essentially a dismissal of everyone '*other* than plaintiff.'  (*Daar, supra*, 67 Cal.2d at p. 699, italics added.)  We emphasized that permitting an appeal was necessary because '[i]f the propriety of [a disposition terminating class claims] could not now be reviewed, it can never be reviewed' (*ibid.*), and we were understandably reluctant to recognize a category of orders effectively immunized by circumstance from appellate review.  This risk of immunity from review arose precisely, and only, because the individual claims lived while the class claims died.  As the United States Supreme Court has explained, '[t]he "death knell" doctrine assumes that without the incentive of a possible group recovery the individual plaintiff may find it economically imprudent to pursue his lawsuit to a final judgment and then seek appellate review of an adverse class determination.'  [Citations.]"  (*Baycol, supra*, 51 Cal.4th at p. 758.)

### 3.  *Appealability of Ruling on Demurrer Generally*

As plaintiff conceded in his opposition to the motion to dismiss, it "is settled that an order sustaining a demurrer is not appealable.  [Citations.]"  (*Evans v. Dabney* (1951) 37 Cal.2d 758, 759.)  "An appeal does not lie from an order sustaining a demurrer without leave to amend [citations], from an order sustaining a demurrer with leave to amend [citation], or from an order granting a motion for judgment on the pleadings [citation]."  (*Singhania v. Uttarwar* (2006) 136 Cal.App.4th 416, 425.)  Instead, an

19

"'order sustaining a demurrer . . . is generally reviewable on appeal from the final judgment in the action.' [Citations.]" (*Ibid.*)

### 4.    *Section 906 Prerequisites to Review of Interim Orders*

As noted, plaintiff invokes section 906 as the statutory basis for his appeal from the order sustaining the demurrer. That section provides, in pertinent part: "Upon an appeal pursuant to Section 904.1 or 904.2, the reviewing court may review the verdict or decision and any intermediate ruling, proceeding, order or decision *which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party,* including, on any appeal from the judgment, any order on motion for a new trial, and may affirm, reverse or modify any judgment or order appealed from and may direct the proper judgment or order to be entered, and may, if necessary or proper, direct a new trial or further proceedings to be had. . . . The provisions of this section do not authorize the reviewing court to review any decision or order from which an appeal might have been taken." (Italics added.)

### 5.    *Analysis*

Recent case law explains that section 906 does not apply to interim orders that are unrelated to the appealable judgment or order from which an appeal is taken. For example, in *Cahill v. San Diego Gas & Electric Co*. (2011) 194 Cal.App.4th 939 (*Cahill*), the defendant utility company appealed from the trial court's order granting the cross-defendant property owners' motion to confirm the good faith of a settlement under Code of Civil Procedure section 877.6 and dismissing the utility company's cross-complaint for equitable indemnity against the property owners. The utility company also sought to appeal from an earlier order denying its motion for summary judgment on the plaintiff's personal injury claims against the company. On appeal, the plaintiff filed a motion to dismiss that portion of the appeal seeking review of the trial court's order denying summary judgment, arguing that the order was nonappealable. (*Id.* at pp. 945-946.) The utility company opposed the motion, contending that although an order denying summary

20

judgment is ordinarily nonappealable, it could nevertheless be appealed as an interim order made appealable under section 906. (*Ibid.*)

The court in *Cahill, supra*, 194 Cal.App.4th 939 held that the order denying the utility company's summary judgment motion was an interim nonappealable order and that section 906 did not authorize an appeal from that order.[4] (*Id.* at p. 949.) In reaching that conclusion, the court in *Cahill* analyzed the three alternative requirements set forth in section 906 that allow appellate review of a nonappealable order. "We conclude none of section 906's three alternative prerequisites to allowing review of a nonappealable, intermediate order apply in this case. First, the order denying [the utility company's] motion for summary judgment against [the plaintiff] does *not* 'involve[] the merits' of the order appealed from (i.e., the order dismissing [the utility company's] cross-complaint for equitable indemnity against [the property] [o]wners). (§ 906.) The order appealed involves the question whether the trial court erred in determining whether [the property] [o]wners' settlement with [the plaintiff] was made in good faith. The order denying [the utility company's] motion for summary judgment against [the plaintiff] does *not* involve the merits of that appealed order, but instead involves the question whether there are any triable issues of material fact precluding summary judgment on [the plaintiff's] personal injury claims against [the utility company]. . . . "

"Second, the order denying [the utility company's] motion for summary judgment against [the plaintiff] does *not* 'necessarily affect[]' the order appealed from (i.e., the order dismissing [the utility company's] cross-complaint for equitable indemnity against

---

[4]    In reaching this conclusion, the court in *Cahill, supra,* 194 Cal.App.4th 939 determined that the trial court's order granting the plaintiff's section 877.6 motion and dismissing the utility company's cross-complaint was a final order from which the utility company could appeal. (*Id.* at p. 945, fn. 3.) Assuming, without deciding, that the *Cahill* court was correct in concluding that a nonsettling party that remains in the action may seek review of a Code of Civil Procedure section 877.6 determination of good faith by a direct appeal (but see *Oak Springs Villas Homeowners Assn. v. Advanced Truss Systems, Inc.* (2012) 206 Cal.App.4th 1304, 1308-1309), we agree with the balance of the analysis in *Cahill* concerning the application of section 906 to the interim order denying the summary judgment motion.

21

[the property] [o]wners). (§ 906.) . . . The second alternative section 906 prerequisite for review of a nonappealable order in this case is *not* whether the order denying [the utility company's] motion for summary judgment *could* affect the order dismissing its cross-complaint against [the property] [o]wners, but rather whether it *necessarily* affects the order dismissing its cross-complaint.' . . . Contrary to [the utitlity company's] assertion, we conclude the trial court's order denying [its] motion for summary judgment against [the plaintiff] does *not* 'necessarily' affect the order dismissing [the utility company's] cross-complaint for equitable indemnity against [the property] [o]wners. (§ 906.) If the trial court correctly denied [the utility company's] motion for summary judgment against [the plaintiff], that decision would not necessarily affect its order dismissing [the utility company's] cross-complaint for equitable indemnity against [the property] [o]wners. . . . [¶] . . . [¶]"

"[Finally, p]ursuant to section 906, a nonappealable intermediate order that 'substantially affects the rights of a party' may be reviewed in conjunction with an appeal of a final judgment or appealable order. The clear import of that provision is to allow an appellate court to review rulings, orders, or other decisions that led up to, or directly related to, the judgment or order being appealed to the extent they substantially affected the rights of one of the parties to the appeal. . . . [¶] Therefore, nonappealable orders or other decisions substantively and/or procedurally collateral to, and not directly related to, the judgment or order being appealed are not reviewable pursuant to section 906 even though they literally may 'substantially affect[]' one of the parties to the appeal." (*Cahill, supra*, 194 Cal.App.4th at pp. 946-948.) The court added that a contrary interpretation "could allow one party to the direct appeal to, in colloquial terms, 'open the floodgates' and bring into the appeal all sorts of collateral or other unrelated intermediate decisions that do not affect the other party to the appeal or the appealed decision, thereby potentially increasing exponentially the issues to be addressed on appeal and the use of limited judicial resources to decide those issues." (*Id.* at p. 948.)

In the recent decision in *Oiye v. Fox* (2012) 211 Cal.App.4th 1036 (*Oiye*), the court similarly concluded that an interim order that is unrelated to the final judgment or

appealable order from which the appeal is taken is not reviewable under section 906. In that case, the trial court entered, inter alia, an order granting a preliminary injunction and requiring the defendant to produce certain financial information to the plaintiff. The defendant appealed from the order, including that portion which required him to produce documents. (*Id*. at pp.1046-1047.) In response, the plaintiff contended that the portion of the order compelling discovery was nonappeable. (*Id.* at p. 1060.)

The court in *Oiye, supra*, 211 Cal.App.4th 1036 agreed with the plaintiff and refused to consider the merits of the discovery order. "As [the] plaintiff points out, generally discovery rulings are not directly appealable and are subject to review only after entry of a final judgment. [Citations.] [¶] [But a]n order granting an injunction is appealable. (§ 904.1, subd. (a)(6).) In an authorized appeal, an appellate court may review 'any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from.' (§ 906.) As [the] plaintiff contends, the discovery order here, though made in the same order as the issuance of an injunction, is unrelated to the merits of the injunction and does not necessarily affect it. [The d]efendant does not respond to this contention. Accordingly, we do not reach the merits of [the] defendant's attacks on the discovery order. (Cf. *NewLife Sciences v. Weinstock* (2011) 197 Cal.App.4th 676, 689 [128 Cal.Rptr.3d 538].)" (*Id.* at p. 1060.)

In this case, as in *Cahill, supra,* 194 Cal.App.4th 939 and *Oiye, supra,* 211 Cal.App.4th 1036, the trial court's earlier order sustaining the demurrers to plaintiff's section 1983 claims does not involve the merits of the directly appealable order—the order denying class certification. The merits of the class certification order involved whether common or individual issues predominated and whether plaintiff was a typical and adequate class representative. The ruling on the demurrer involved whether plaintiff had pleaded facts sufficient to support his section 1983 claims, including whether he had stated facts sufficient to avoid the bar of the qualified immunity doctrine. Whether a plaintiff has pleaded an individual cause of action is an inquiry that is distinct from whether there are predominant issues of law and fact or whether a putative class representative has typical claims and is an adequate representative. As noted above,

23

"[t]he certification question is 'essentially a procedural one that does not ask whether an action is legally or factually meritorious'" (*Sav-On Drug Stores, supra,* 34 Cal.4th at p. 326), whereas a ruling on a demurrer directly involves the factual and legal merits of a claim.

Similarly, the ruling on the demurrers did not necessarily affect the decision not to certify the class. As the court in *Cahill, supra,* 194 Cal.App.4th 939 explained, the inquiry is not whether the ruling on the demurrers *could* affect the certification decision, but rather whether the sustaining of the demurrer to the section 1983 claims *necessarily* affected the order denying certification. Because the two orders deal with unrelated issues, they do not necessarily affect one another. Therefore, the ruling on the demurrer is not appealable under section 906 as necessarily related to the directly appealable order.

Finally, the ruling on the demurrer did not "substantially affect" the rights of a party" under section 906 because that ruling did not *lead up to or directly relate to* the certification decision. Again, the ruling on the demurrer involved the factual and legal merits of certain claims, i.e., whether the section 1983 claims were barred by the qualified immunity doctrine, but the ruling on the certification motion involved the wholly separate procedural question of whether common issues predominated over individual issues and whether plaintiff's claims were typical of the class members' claims and he was an adequate class representative. As a result, plaintiff's appeal from the demurrer order is not reviewable under section 906 as an interim order that substantially affected the rights of a party.

This conclusion is further illustrated by the decision in *Wallace v. GEICO Ins. Co.* (2010) 183 Cal.App.4th 1390 (*Wallace*). In that case, the trial court entered an interim order finding that the plaintiff lacked standing to act as the class representative. Thereafter, the defendant moved to strike the class allegations. In a footnote, the court held that the interim order was appealable under section 906 as an order affecting the appealable order striking the class allegations. The court reasoned that, "[a]n order striking class allegations is immediately appealable under the death knell doctrine established in *Daar*[*, supra,*] 67 Cal.2d 695 [63 Cal.Rptr. 724, 433 P.2d 732], under

24

which an order that 'determines the legal insufficiency of the complaint as a class suit and preserves for the plaintiff alone his cause of action for damages' has a '"legal effect" . . . tantamount to a dismissal of the action as to all members of the class other than plaintiff.' (*Id*. at p. 699, citation omitted.) We may also review 'any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the . . . order appealed from.' (Code Civ. Proc., § 906.) Thus, the ruling that [the plaintiff] lacks standing to serve as a class representative is also within the scope of our review, as that ruling *impacted* the trial court's decision to strike the class allegations." (*Id*. at p. 1396, fn. 5, italics added.)

The sustaining of the demurrers to the section 1983 claims here did not directly "impact" the class certification issue, as did the adverse ruling on the putative class representative's standing to pursue the class claims in *Wallace, supra,* 183 Cal.App.4th 1390. The latter ruling in *Wallace* became the legal predicate for the subsequent motion to strike the class claims, whereas the ruling on the demurrers was not mentioned, much less relied upon, by either party during the proceedings that culminated in the order denying class certification.

## DISPOSITION

The trial court's order denying class certification is affirmed, and the appeal from the trial court's order sustaining the demurrer to plaintiff's section 1983 causes of action is dismissed. Defendants shall recover their costs on appeal.

**CERTIFIED FOR PUBLICATION**

MOSK, J.

We concur:

KRIEGLER, J.

O'NEILL, J.[*]

---

[*] Judge of the Superior Court of the County of Ventura appointed by the Chief Justice pursuant to article VI, section 6 of the California Constitution.