Filed 4/27/21  Townsend v. State of California CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| TREVON TOWNSEND, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> STATE OF CALIFORNIA et al., <br><br> Defendants and Respondents. | F079296 <br><br> (Super. Ct. No. 18C0066) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Kings County.  Randy L. Edwards, Judge.

Kiesel Law, Paul R. Kiesel, Steven D. Archer, Jeffrey A. Koncius, Melanie Meneses Palmer; Law Offices of Sanford Jossen and Sanford Jossen for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Monica N. Anderson, Senior Assistant Attorney General, Misha D. Igra and Cassandra J. Shryock, Deputy Attorneys General, for Defendants and Respondents.

-ooOoo-

Plaintiff, an inmate who was released from prison two days late, filed this lawsuit to recover damages for false imprisonment.  His pleading included class action

allegations for other inmates who had their release dates miscalculated. Defendant California Department of Corrections and Rehabilitation (CDCR) and the other defendants filed a series of three motions to strike the class action allegations from plaintiff's original and subsequent amended complaints. The trial court granted all three motions, the last one without leave to amend. Plaintiff appealed.

Plaintiff's second amended complaint and its exhibits contain detailed information about how inmate credits are applied and how release dates are calculated. That information demonstrates that individual issues predominate over common issues in determining a particular inmate's correct release date. Therefore, this lawsuit should not proceed as a class action.

We therefore affirm the order granting the motion to strike class allegations.

**FACTS**

*CDCR Calculation of Release Dates*

Defendant CDCR is an agency of the State of California and responsible for administering the State's prison system, which includes 34 adult prisons and eight juvenile facilities. CDCR employees are responsible for calculating the release dates of inmates held in the custody and control of all prisons in the State of California. When an inmate arrives at a new institution, an intake audit is conducted for the purpose of calculating the inmate's release date. The intake audit should be performed within 30 days of the new institution's receipt of the inmate's file. Pursuant to section 71010.13 of CDCR's Department Operations Manual, other audits of an inmate's case records are conducted 60 days prior to a scheduled release date (60-day audit), 10 days prior to a scheduled release date (10-day audit), and at other times determined by the Correctional Case Records Manager.

The audit includes a review of the minute order and abstract of judgment from the inmate's criminal case and the identification of the level at which the inmate is earning credits and any credits lost or gained. Information obtained during the review of the

2.

inmate's file is entered on a preprinted form called a calculation worksheet. When the inmate is serving a determinate sentence, CDCR Form 1897-U, "CALCULATION WORKSHEET—*DETERMINATE (DSL)*," is used. The preprinted, opening paragraph of this form provides in part:

> "This form is used to calculate the Earliest Possible Release Date (EPRD) for inmates sentenced to serve a determinate (DSL) term. DSL terms with offense date(s) prior to January 1, 1983 are entered into Offender Based Information System (OBIS) as Credit Code 2 and earn one-third credit per Penal Code (PC) Section 2931. Non-violent DSL terms (offense date on or after January 1, 1983) are entered into OBIS as Credit Code 1 and eligible for up to day for day credit per PC Section 2933, (two for one credit if eligible per PC 2933.3). Second-strike DSL terms are entered into OBIS as Credit Code 3 … and earn 20% credit."

The paragraph also describes Credit Codes 4, 5 and 6. Section A of the worksheet is used to calculate an original Earliest Possible Release Date (EPRD). Section B is used to recalculate the EPRD, which may be necessary because of a change in credit earning status, a credit loss, or a credit restoration. Section C, labeled "Mixed Credit Codes," is used when the inmate is serving consecutive terms and the rate at which credits are earned during each term is different. Section D is used to track work group changes and CDCR incarceration credit earned. Section E is used to record credit losses and restorations. Section F lists milestone completion credits, which are earned by successfully completing specific performance objectives in rehabilitative programs. Milestone completion credits are authorized by Penal Code section 2933.05.

Section 71010.13.3 of CDCR's Department Operations Manual requires case records staff to use an audit check sheet when performing an audit. The sheet contains a checklist of factors that must be reviewed during the audit. After an audit is complete, staff must make an entry on the CDC Form 112, "Chronological History," in the inmate's central file showing the date of the audit and the auditor's initials.

CDCR maintains a central file for each inmate in its custody. The central file is held by the records office of the institution housing the inmate. When an inmate is transferred, the central file is transferred with the inmate. Documents included in an inmate's file include a CDC Form 112, "Chronological History," and the calculation worksheets completed for each audit.

*Townsend's Release Date*

Plaintiff Trevon Townsend was convicted and sentenced to two years in state prison on August 10, 2010. Townsend was incarcerated at Wasco State Prison Reception Center from August 10, 2010, to October 27, 2010, when he was transferred to the California Substance Abuse Treatment Facility at Corcoran State Prison.

On September 8, 2010, R. Yeager, a Correctional Case Records Administrator, completed a Calculation Worksheet—Determinate (DSL), CDCR Form 1897-U, and determined Townsend's original EPRD was April 20, 2011. Line A1 listed Townsend's start date as August 10, 2010. Line A2 listed the length of his sentence as two years. Line A3 showed 205 days of presentence credit and 13 days of postsentence credit. Line A4, "Minus Vested Credit," showed six days of vested credit. The instructions for line A4 stated "Credit Code 1, Divide by 1 or 2" and round down fractions. Based on these entries, Townsend's "Maximum Date" was listed on line A6 of the form as December 30, 2011. As a result, his "Days to Serve" and "Days where credit may be applied" (lines A8 and A10, respectively) were determined to be 508 days. Using Credit Code 1, the 508 days was divided by two to produce a credit of 254 days. Subtracting this 254-day credit from his "Maximum Date" resulted in Townsend's original EPRD being April 20, 2011.

A subsequent calculation worksheet was completed in connection with an intake audit at the California Substance Abuse Treatment Facility. The worksheet was dated December 16, 2010, showed Townsend earned a one-day CDCR Incare Credit and a 14-day milestone completion credit. The class code for the milestone was listed as "L010109." The worksheet identified Townsend's adjusted EPRD as April 6, 2011.

4.

The next audit of Townsend's file was the 60-day audit. It resulted in the completion of another calculation worksheet on January 19, 2011. Like the worksheet from five weeks earlier, it listed Townsend's adjusted EPRD as April 6, 2011.

On April 4, 2011, V. Magaña, a Correctional Case Records Administrator, performed a 10-day audit and completed a calculation worksheet. This worksheet showed Townsend's adjusted EPRD as April 3, 2011. The first difference from the data entered on prior worksheets occurred at line A4, "Minus Vested Credits." The earlier forms had entered six days; Magaña entered 13 days. This seven-day increase of a credit changed Townsend's "Maximum Date" from December 30, 2011, to December 23, 2011. As a result, Townsend's time remaining to serve for which he could earn an incarceration credit was reduced to 499 days. When Townsend's CDCR Incare credit (1 day), milestone completion credit (14 days), and incarceration credit (Credit Code 1) were applied to the new Maximum Date, his adjusted EPRD was April 3, 2011.

According to a CDC Form 3017, "Relevant Central File Information," completed by Magaña, at 12:25 p.m. on April 4, 2011, Magaña contacted the floor officer of B-yard, Building 3 and relayed the information about Townsend's adjusted release date. The officer told Magaña he would notify Townsend of the change in Townsend's release date to April 5, 2011.

*Late Release Report*

In July 2011, CDCR personnel completed a preprinted form titled "EARLY/LATE RELEASE REPORT"[1] setting forth information about Townsend's late release. It stated Townsend was released two days late and gave the reason for the error as "Vested credit calculated at 1/3 should have been day for day." This reference to vested credit corresponds to line A4 of the calculation worksheet, which is labeled "Minus Vested

---

[1]    The Early/Late Release Report is a form used in all 34 prisons in the State of California's prison system.

Credit." The report also stated the error was discovered "[a]t the 10 Day Audit, after review of the rap sheets and POR with CCRS it was determined he was eligible for day for day vested credits."[2] The action taken to prevent the error from reoccurring was "[t]raining … conducted with [case record administrators]."

According to CDCR's late release reports, calculation errors caused no less than 11,160 persons were over-detained between January 1, 2004, and March 6, 2014, for a total of 123,419 days. For example, in 2004, 1,947 were over-detained anywhere from 1 to 976 days. In 2012 and 2013, 283 and 62 persons, respectively were over-detained.

CDCR's 2016 Outcome Evaluation Report provides information about recidivism of persons released from CDCR custody. Table A lists conviction rates of offenders released from adult institutions in fiscal year 2002-2003 through fiscal year 2013-2014. The column in Table A of interest in this litigation contains the number of offenders released in each fiscal year. By comparing the number of inmates released in a particular period with the number of late releases in that period, it is possible to generate an error rate.

For example, if the number of over-detained inmates in 2004 (1,947) is divided by the number of inmates released in fiscal year 2003-2004 (99,635), an error rate of approximately 1.95 percent is produced. If the number of over-detained inmates in 2012 and 2013 (283 plus 62 equals 345) is divided by the number of inmates released in fiscal years 2011-2012 and 2012-2013 (74,875 plus 35,745 equals 110,620), an error rate of approximately 0.31 percent is produced. This percentage is the equivalent of one over-detention for every 320 inmates released during that two-year period.

---

**2** POR is the acronym for Probation Officer Report. CCRS is the acronym for Correctional Case Records Supervisor.

## PROCEEDINGS

In December 2017, Townsend filed this action in Los Angeles County Superior Court seeking damages, injunctive relief, and declaratory relief for himself and for a proposed class of inmates who were retained after their correct release date. The complaint included the designation "CLASS ACTION" in its caption and a separate heading entitled "CLASS ACTION ALLEGATIONS" as required by California Rules of Court, rule 3.761.[3] In February 2018, the action was transferred to and accepted in Kings County Superior Court.

In May 2018, defendants filed a motion to strike class action allegations in Townsend's complaint. In June 2018, the trial court granted the motion to strike with leave to amend.

After Townsend filed a first amended complaint, defendants filed another motion to strike the class action allegations from that pleading. Again, the trial court granted the motion to strike with leave to amend.

In December 2018, Townsend filed a second amended complaint for damages (SAC), alleging causes of action for false imprisonment and breach of mandatory public entity duties. The SAC is the operative pleading for purposes of this appeal. Defendants filed a motion to strike its class action allegations. Defendants supported their motion with a request for judicial notice of Table A in CDCR's 2016 Outcome Evaluation Report, which lists the total number of inmates released from CDCR custody annually from fiscal year 2002-2003 through fiscal year 2013-2014.

Townsend's opposition to the motion to strike stated he proposed a class of all persons who were incarcerated in California state prisons and held in custody beyond their lawful release date as a result of release date calculation errors. Alternatively, he proposed subclasses of all persons held in custody beyond their lawful release date as a

---

[3] Subsequent references to a numbered "Rule" are to the California Rules of Court.

result of (1) a credit coding error or (2) a misapplication of earned credits. Townsend argued that he had sufficiently alleged and identified a uniform policy or practice and that questions of law or fact common to the proposed class or subclasses predominated over individual questions. Townsend also asserted he was an adequate representative of the proposed class or subclasses.

Defendants' reply argued the release date errors alleged in the SAC arose from a failure to accurately perform basic addition, subtraction, division and multiplication and these math errors did not constitute a uniform policy or practice. In defendants' view, the alleged errors necessarily presented individual issues and, therefore, common issues did not predominate. Defendants also argued the class allegations were virtually identical to those stricken in *Lopez v. Brown* (2013) 217 Cal.App.4th 1114.

The trial court's tentative ruling stated the court would grant the request of judicial notice of the 2016 report and would grant the motion to strike the class allegations in the SAC without leave to amend. On April 19, 2019, the court heard arguments and then adopted its tentative ruling. In May 2019, Townsend filed a timely notice of appeal from the April 19, 2019 order granting the motion to strike the class allegations in the SAC. "An order striking class allegations is immediately appealable." (*Wallace v. GEICO General Ins. Co.* (2010) 183 Cal.App.4th 1390, 1396, fn. 5.)

### DISCUSSION

I.   BASIC LEGAL PRINCIPLES

    A.   <u>Class Actions in California</u>

        *1.   Statute and Rule*

Code of Civil Procedure section 382 authorizes a class action "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." The statute operates as an exception to the general rule of compulsory joinder of all interested parties.

8.

(*Weaver v. Pasadena Tournament of Roses Assn.* (1948) 32 Cal.2d 833, 837.)  According to our Supreme Court, it is based on the doctrine of virtual representation, rests upon considerations of necessity and convenience, and was adopted to prevent a failure of justice.  (*Ibid*.)

Code of Civil Procedure section 382 does not provide a procedural framework for class actions.  "In 2002, California adopted a series of court rules specifically governing class actions."  (*Los Angeles Gay & Lesbian Center v. Superior Court* (2011) 194 Cal.App.4th 288, 301.)  The series is now numbered Rule 3.760 to 3.771.  The rules "apply to each class action brought under ... Code of Civil Procedure section 382 until the court finds the action is not maintainable as a class action or revokes a prior class certification."  (Rule 3.760(a).)

### 2.     *Procedures for Determining Suitability*

Rule 3.764(a) provides:  "Any party may file a motion to: (1) Certify a class; (2) Determine the existence of and certify subclasses; (3) Amend or modify an order certifying a class; or (4) Decertify a class."  The California Rules of Court do not explicitly authorize the use of a demurrer or motion to strike to raise the question of whether a lawsuit is suitable to proceed as a class action.  Generally, this question is "not decided at the pleading stage of a lawsuit."  (*In re BCBG Overtime Cases* (2008) 163 Cal.App.4th 1293, 1298 (*BCBG Overtime*).)  Instead, the procedure authorized by the California Rules of Court involves a noticed motion and the presentation of evidence. (Rule 3.764(c), (d).)

As to timing, a certification motion "should be filed when practicable."  (Rule 3.764(b).)  Trial courts, however, have the discretionary authority to set a deadline for filing a certification motion.  (Rule 3.764(b).)  When exercising this discretion, the court "must take into account discovery proceedings that may be necessary to the filing of the motion."  (*Ibid*.)

9.

The motions listed in Rule 3.764(a) are not the exclusive means for raising the question of whether the lawsuit is suitable to proceed as a class action. In *BCBG Overtime*, the Fourth District relied on a case decided more than 20 years before the adoption of the California Rules of Court addressing class actions to conclude the putative class action may be defeated by a demurrer or motion to strike "if the defects in the class action allegations appear on the face of the complaint or by matter subject to judicial notice." (*BCBG Overtime*, *supra*, 163 Cal.App.4th at pp. 1298–1299; see *Tucker v. Pacific Bell Mobile Services* (2012) 208 Cal.App.4th 201, 211 (*Tucker*).)

Based on *BCBG Overtime*, *Tucker*, and the cases cited therein, we conclude the question of whether a lawsuit should proceed as a class action may be raised at the pleading stage. The parties do not contend otherwise. They treat the trial court's order granting the motion to strike as a decision made at the pleading stage. The standard of appellate review for such a decision is different from the standard of review applied to the denial of a motion for certification of a class action. (See pt. I.B., *post*.)

### 3. Criteria for Proceeding as a Class Action

Our Supreme Court has identified specific requirements that must be met for a lawsuit to proceed as a class action. (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).) The party moving for class certification "must demonstrate the existence of [1] an ascertainable and [2] sufficiently numerous class, [3] a well-defined community of interest, and [4] substantial benefits from certification that render proceeding as a class superior to the alternatives." (*Ibid.*) The requisite community of interest is satisfied when there are (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class. (*Ibid.*) When these three factors are substituted into the list of what a party seeking certification must demonstrate, there are a total of six criteria for class certification identified by our Supreme Court—

10.

namely, (1) ascertainability, (2) numerosity, (3) predominance of common questions, (4) typicality, (5) adequacy of representation, and (6) superiority.

The appellate briefing in this case addresses two of the six criteria. First, are there "predominant common questions of law or fact"? (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 470 (*Dart*).) Second, can Townsend adequately represent the proposed class? (*Brinker*, *supra*, 53 Cal.4th at p. 1021.) Based on the issues raised in the briefing, we next set forth some of the principles that define these two requirements.

### 4. *Predominance of Common Questions*

The requirement for a predominance of common questions presents the question of "whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' " (*Brinker*, *supra*, 53 Cal.4th at p. 1021.) The answer depends on whether the theory of recovery " 'is, as an analytical matter, likely to prove amenable to class treatment.' " (*Ibid*.) Typically, a court examines the allegations in the complaint and the declarations supporting the motion to certify the class and considers whether the legal and factual issues they present are such that their resolution in a single proceeding would be both desirable and feasible. (*Id*. at pp. 1021–1022.) For instance, if a defendant's liability can be determined by facts common to all members of the class, a class action is appropriate even if the members must prove their damages individually. (*Id*. at p. 1022.)

### 5. *An Adequate Representative*

Townsend, as the party seeking to represent the class, has the burden of proving the adequacy of his representation. (*Dart*, *supra*, 29 Cal.3d at p. 470.) The requirement of adequate representation is designed to ensure "the class's champion will pursue its interests sufficiently well so as to produce a judgment that can fairly bind all members of a group who cannot appear before the court individually." (1 Newberg on Class Actions

11.

(5th ed. 2011) § 3:50.) Thus, the requirement is rooted in the need to provide procedural due process to those who will be bound by the judgment. (*Ibid.*) Generally, a putative representative cannot adequately represent the class—that is, protect its interests—if the representative's interests are antagonistic to or in conflict with the objectives of those he purports to represent. (*Dart*, *supra*, 29 Cal.3d at p. 470.) Thus, evidence of the existence of actual antagonism within the class is relevant. (*Espejo v. The Copley Press, Inc.* (2017) 13 Cal.App.5th 329, 352 (*Espejo*).) In addition, the competency and commitment of class counsel are factors relevant to determining the adequacy of representation. (*Id.* at pp. 352–353.)

    B.    Standard of Review

In *Tucker*, the First District noted a divergence in decisions of the Court of Appeal on the level of scrutiny given to demurrer rulings on class action pleadings, particularly when the demurrer is sustained. (*Tucker*, *supra*, 208 Cal.App.4th at p. 211.) The First District cited its earlier decision for the principle that a trial court may sustain " 'a demurrer to the class action allegations of a complaint only if it concludes as a matter of law that, assuming the truth of the factual allegations in the complaint, there is no reasonable possibility that the requirements for class certification will be satisfied.' " (*Ibid.*) The court also acknowledged the existence of cases concluding "there is a policy disfavoring the determination of class suitability issues at the pleading stage." (*Id.* at p. 213.)

The parties' appellate briefing refers to the no-reasonable-possibility standard set forth in *Tucker*. Consequently, we adopted that standard for our review of the order granting defendants' motion to strike class allegations without leave to amend. Thus, we consider whether we can " 'conclude[] as a matter of law that, assuming the truth of the factual allegations in the complaint, there is no reasonable possibility that the

12.

requirements for class certification will be satisfied.' " (*Tucker*, *supra*, 208 Cal.App.4th at p. 211.)

In contrast, a trial court's decision on a motion to certify a class action " 'rests squarely within the discretion of the trial court' " and is afforded great deference by the appellate court. (*Brinker*, *supra*, 53 Cal.4th at p. 1022.) Trial courts are regarded as being ideally suited to evaluate the efficiencies and practicalities of permitting group action. Consequently, a trial court's order on a certification motion will be affirmed unless (1) the underlying findings of fact are unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on an erroneous legal assumption. (*Ibid.*)

II. PREDOMINANCE

A. Trial Court's Decision

The trial court took judicial notice of the CDCR's 2016 Outcome Evaluation Report, which set forth the total number of inmates released by CDCR for a dozen fiscal years ending 2013-2014. The court noted the defendant used this information along with data contained in exhibits to the SAC to contend the release date of state prisons was accurate for 99 percent of the inmates. The court assumed the "defendants have computed the error rate in release dates for each fiscal year from these CDCR documents" because Townsend did not object to or otherwise contest the calculation of the error rate.

The trial court granted the motion to strike the class allegation based on its determination that the contents of the SAC showed there was no reasonable probability Townsend could establish a community of interest among the potential class members. Specifically, the court stated "that individual issues predominate over common questions of law and fact." Because the trial court applied the no-reasonable-possibility standard and cited *Tucker* as authority for this standard, we conclude the trial court chose the correct legal standard for evaluating the motion to strike. As a result, the question

13.

narrows to whether the trial court properly applied this standard to the allegations set forth in the SAC and the matters subject to judicial notice.[4]

Addressing the contents of the SAC, the trial court's order stated the pleading failed "to allege a specific policy or practice that was uniformly applied to the calculations of the putative class members' release dates to result in over-detentions." The order cited paragraphs 33 and 41 of the SAC and stated they "alleged that the uniform policy and practice consisted of defendants' mistakes in calculating inmate release dates." The court noted the SAC listed the types of credit application errors that can result in over-detentions and concluded the SAC relied on individual errors and miscalculations as the cause of over-detentions. The court determined "that despite two prior opportunities to allege a specific uniform practice and policy of over-detention that could be applied to all similarly situated inmates, the SAC continues to rely on inmate specific miscalculations of release dates." As a result, the court concluded that common issues did not predominate.

B.      Analysis

        1.      Contentions

On appeal, Townsend argues that he need not identify a specific policy or practice that caused harm to the members of the proposed class. Alternatively, he argues the SAC sufficiently alleged a uniform policy or practice. Townsend contends the class claims were adequately pleaded and should not have been stricken because common questions of law and fact predominate, his claims are typical of the class, and he is an adequate representative.

Defendants contend the trial court applied the correct legal standard for disposing of class claims at the pleading stage—that is, the court determined there was no

---

[4]     On our own motion, we take judicial notice of the contents of Townsend's central file that are included in the appellate record. (Evid. Code, §§ 452, subd. (c), 459.)

reasonable possibility Townsend could plead the requisite community of interest among class members. Defendants argued there was no uniform policy or practice that allegedly caused the over-detentions and, consequently, individual issues predominate. Defendants asserted *Lopez v. Brown*, *supra*, 217 Cal.App.4th 1114 set forth controlling principles that establish Townsend has no reasonable probability of pleading a community of interest in the absence of a uniform policy or practice causing the over-detention.

For purposes of this appeal, we place little reliance on *Lopez v. Brown*, *supra*, 217 Cal.App.4th 1114. Although that case involved an attempt to bring a class action on behalf of over-detained inmates, its procedural posture was different from the present appeal. In *Lopez v. Brown*, the trial court denied a motion for class certification. (*Id*. at p. 1118.) The Second District applied the deferential abuse of discretion standard of review. (*Id*. at p. 1125.) Here, the applicable standard of review is quite different and, therefore, the conclusions reached by the Second District provide no precedent for applying the no-reasonable-possibility standard to the allegations made in the case.

### 2. *Uniform Policy or Practice*

Townsend asserts the root causes of the over-detentions that are the subject of the SAC are "Defendants' common policies or practices, not errant, one-off occurrences made by individual employees. Indeed, the SAC clarifies that these common practices include repeated misapplication of the credit limitations of Penal Code sections 2933.1(a) and 2931, which limit an inmate's custody earning capacity to 15% or 33.3%, respectively, as well as routine failure to apply milestone credits earned under Penal Code section 2933.05, and the failure to perform regular and adequate release-date reviews." Thus, in Townsend's view, the over-detentions do not arise merely from individual errors, but stem from common practices that lead CDCR employees to incorrectly calculate inmate release dates. We disagree.

Initially, we conclude that the existence of a common practice is not properly classified as an "ultimate fact" for pleading purposes. (See *Burks v. Poppy Const. Co.* (1962) 57 Cal.2d 463, 473–474 [distinction between conclusions of law and ultimate facts for pleading purposes].) Thus, the statement in paragraph 74 of the SAC that "Defendants have engaged in a uniform pattern and practice of miscalculating inmate release dates" does not properly allege the existence of a common practice.

Consequently, we consider whether the factual allegations set forth in the SAC are sufficient to plead the existence of a common practice that causes over-detention of inmates. This examination includes a review of the exhibits attached to the SAC, which include (1) CDCR's internal records of late releases between 2004 and 2014 (Exhibit 1); (2) the Early/Late Release Reports for Townsend and 12 other inmates (Exhibits 2–14); and (3) the three-page training document referred to as CDCR "Credit Earning '101' " (Exhibit 15). In addition, because a February 6, 2013 entry in Exhibit 1 refers to the use of a "1897-U worksheet" to recalculate a release date, we also consider the contents of CDCR's calculation worksheet (Form 1897-U).

The SAC does not allege the three-page training document, listing the many types of credits and describing how they are calculated, contains error and, thus, constitutes a practice of training CDCR personnel to commit error in calculating release dates. The 13 late release reports attached to the SAC include boxes for stating the reason for the erroneous release, how the error was discovered, and the action taken to prevent error from reoccurring. One report left the corrective action box blank, another report listed "N/A," and the remaining 11 reports referred to training. For example, Townsend's late release report stated: "Training was conducted with CCRAs." These forms demonstrate the miscalculations are errors specific to the individual inmate and the corrective action is not to change a policy or practice, but to train the personnel to apply credit and make calculations in accordance with existing law and policy. None of the reports refer to the

16.

need to change (1) the forms used, (2) a policy or instructions for completing the forms, or (3) a practice that creates errors.

To summarize, the documents attached to the SAC and CDCR's worksheet establish that determining whether a putative class member's release date was properly calculated requires one to identify the inmate's sentence, credit earning rate, and various types of credits. This specific information is then used to compute the inmate's correct release date. The errors that occur are specific to the circumstances of each inmate. Consequently, we conclude the detailed information provided makes it clear that there is no reasonable probability that Townsend would be able to demonstrate the existence of a common practice that results in the miscalculation of release dates. (*Tucker*, *supra*, 208 Cal.App.4th at p. 211.) Stated another way, the errors are deviations from the common practice[5] of correctly calculating release dates.

### 3. Common Issues

For purposes of this appeal, we assume without deciding that Townsend is correct in asserting he "need not plead the specific policy or practice that led to the harm imposed on the class in order to survive a motion to strike class allegations." Nonetheless, there must be a reasonable possibility that the requirement for a predominance of common issues of law or fact will be satisfied. (*Tucker*, *supra*, 208 Cal.App.4th at p. 211.)

Here, the extensive information provided in exhibits to the SAC shows that individual issues will predominate when determining whether an inmate's release date was miscalculated and, as a result, there is no reasonable possibility Townsend will be able to satisfy the requirement for a predominance of common issues. As described earlier, the determination of whether a particular inmate was over-detained requires

---

[5]    In this context, the term "common" refers to what happens approximately 99 percent of the time.

17.

information specific to that inmate and the completion of a series of calculations that produce a release date unique to that individual.  Information that is specific to the individual will predominate when it comes to completing the calculations necessary to identify the correct release date.  As a result, we conclude there is no reasonable possibility that common questions of law or fact will predominate the resolution of whether a putative class member was over-detained.

## DISPOSITION

The order striking the class action allegations is affirmed.  Respondents shall recover their costs on appeal.


FRANSON, J.

WE CONCUR:


LEVY, Acting P.J.


MEEHAN, J.


18.